**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| STACEY FLETCHER, on behalf of herself and all others similarly situated, | ) ) ) | Case No. _____ |
| Plaintiff, | ) ) | **CLASS ACTION COMPLAINT** |
| -v- | ) ) ) | *Jury Trial Demanded* |
| INDYMAC MORTGAGE SERVICES, FSB, a division of ONEWEST BANK, FSB, | ) ) ) | |
| Defendant. | ) | |

**NATURE OF THE ACTION**

1.    This case arises out of the pervasive and repeated failure of IndyMac Mortgage Services, FSB ("IndyMac") to honor its agreements with borrowers across the nation to modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").    Plaintiff Stacey Fletcher ("Plaintiff") brings this action pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, and common law on behalf of herself and a class of similarly situated homeowners nationwide ("Nationwide Class"), as well as a Subclass of Illinois homeowners ("Illinois Subclass").    Plaintiff seeks damages on her own behalf and on behalf of all other similarly situated homeowners, as well as injunctive relief to ensure that IndyMac fulfills its obligation to modify the loans of Plaintiff and members of the Class.

2.    HAMP was created by the federal government in August 2009 to combat the national "foreclosure crisis."    The program was specifically designed to allow eligible homeowners who are at imminent risk of defaulting on their mortgages to save their homes by modifying the terms of their mortgage loans.    Thus, when IndyMac, a participating servicer in HAMP and an agent for a major financial institution, OneWest Bank, promises to consider

modification of an eligible loan under HAMP to prevent foreclosure, homeowners who live up to their end of the bargain reasonably expect that IndyMac will keep its promises. Yet Plaintiff and thousands of other homeowners have been and continue to be wrongfully deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes under this federal program because IndyMac unjustifiably denies loan modifications and engages in a systematic effort to avoid granting permanent loan modifications.

3. IndyMac's practices have fallen into an identifiable pattern that is consistent across a wide range of homeowners: IndyMac makes a written offer to a pre-qualified homeowner, in which it offers to provide the homeowner with a permanent loan modification if the homeowner makes three monthly trial period payments and complies with IndyMac's requests for documentation. Homeowners accept IndyMac's offer by executing the required documents, by submitting the required documentation and by making payments. Despite this performance, IndyMac fails to live up to its end of the bargain. In addition, IndyMac unjustifiably denies permanent modification or avoids permanent modification by losing paperwork, claiming ignorance of payments made and papers submitted, and engaging in other evasive conduct which makes it extraordinarily difficult, if not completely impossible, for homeowners to obtain a loan modification.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C.§ 1332(d)(2). These claims are brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from Defendant. IndyMac is, on information and belief, a citizen of California and plaintiff is a citizen of Illinois.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as the unlawful practices are alleged to have been committed in this District, upon information and belief Defendant regularly conducts business in this District, and the named Plaintiff resides in this District.

## THE PARTIES

6. Stacey Fletcher is a divorced custodial parent residing with her child in Yorkville, Kendall County, the State of Illinois.

7. OneWest Bank, FSB is a mortgage lender with its headquarters at 888 East Walnut Street, Pasadena, CA 91101. OneWest Bank, FSB (through a holding company) completed the purchase of the assets and operations of IndyMac from the FDIC in March 2009. OneWest operates as a regional bank in Southern California. Since the acquisition, OneWest has operated the national mortgage banking business of IndyMac. As a condition of the sale of IndyMac, OneWest agreed to continue the FDIC's existing loan modification program.

8. IndyMac Mortgage Servicing, FSB currently is a division of OneWest Bank, FSB, receiving mail at P.O. Box 4045, Kalamazoo, MI 49003-4045. Prior to its acquisition by OneWest, IndyMac Bank had been seized and auctioned off by the FDIC. Before its failure, IndyMac was one of the largest savings and loan associations in the Los Angeles area and the seventh largest mortgage originator in the United States. IndyMac Bank was founded as Countrywide Mortgage Investment in 1985 as a means of collateralizing Countrywide loans that were too big to be sold to Fannie Mae and Freddie Mac. In 1997, Countrywide spun off IndyMac as an independent company.

## FACTUAL BACKGROUND

***Congressional Response to National Foreclosure Crisis***

9.      Over the last three years, the United States has witnessed a foreclosure crisis. A congressional oversight panel noted in 2009 that one in eight U.S. mortgages is currently in foreclosure or default.[1]   Increased foreclosures have a detrimental effect on borrowers who are at serious risk of losing their homes. Foreclosures also have a negative impact on the surrounding neighborhoods that suffer decreased property values, and on municipalities that lose tax revenue as a result of foreclosures.

10.      On October 3. 2008, Congress passed the Emergency Economic Stabilization Act of 2008, subsequently amended by the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 *et. seq.* (2009).  The purpose of the Act was to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C.A. §5201.

11.      The Act granted the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. §5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.*   In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. §5213(3).

12.      The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to

---

[1]   Congressional Oversight Panel, Oct. 9, 2009 report, *available* at URL http://cop.senate.gov/press/releases/release-100909-foreclosure.cfm (last visited June 28, 2010).

maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C.A. §5219. The Act also grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." 12 U.S.C.A. §5129. and imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C.A. §5220.

13.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.  The Making Home Affordable program consists of two subprograms. The first subprogram relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.  The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.

14.     HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.  Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.  Servicers receive $1,000.00 for each HAMP modification.

***Broken Promises Under HAMP***

15.     The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are

known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. Defendant IndyMac Mortgage Servicing, FSB is a servicer operated by OneWest Bank. In servicing loans and taking the actions described herein, IndyMac was acted in the capacity of an agent for the entities that held the mortgage loans at issue.

16. Should a servicer elect to participate in HAMP,[2] it executes a Servicer Participation Agreement ("SPA") with the federal government.

17. In connection with its purchase of IndyMac in the FDIC auction, OneWest was required to continue the FDIC's existing loan modification program at IndyMac. In a Company press release announcing the completion of the acquisition, the Chairman and Chief Executive Officer of OneWest Bank Group confirmed OneWest's commitment to working with the government to assist homeowners: "We appreciate the support of the FDIC and the OTS in completing this transaction, and we are committed to continuing our work with the FDIC and other government agencies to implement programs to help homeowners…."

18. Consistent with that purported goal, on August 18, 2009, Tony Ebers, Executive Vice President and Chief Operating Officer of OneWest Bank executed an SPA, thereby making IndyMac a participating servicer in HAMP.[3] The SPA executed by Mr. Ebers incorporates all

---

[2] Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program, are subject to mandatory inclusion in HAMP. Otherwise, participation by servicers in the HAMP program is voluntary.

[3] Despite IndyMac's outward expression of its desire to modify loans and prevent foreclosures, according to an October 2009 report issued by the National Consumer Law Center entitled "Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior," it is more profitable for a loan servicer, such as IndyMac, to foreclose on a property than to grant a loan modification. This is because the loan servicers' main source of revenue derives from: (a) monthly servicing fees, which are a fixed percentage of the unpaid principal balance of the loans in the pool; (b) fees charged to borrowers in default; (c) float income (interest income from the time between when the servicer collects the payment from the borrower and when it turns the

"guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation" (SPA at ¶ 1.A.), and are incorporated by reference herein.

19.     The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." (SPA at ¶¶1.A., 2.A.)[4]

20.     The Program Documentation requires Participating Servicers to evaluate all loans that are 60 or more days delinquent for HAMP modifications. (SD 09-01 at 4.)  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.  According to the terms of the offer accepted by Plaintiff, a customer's verified income is the determinant of whether a customer is eligible for a permanent modification and the terms of that final modification.

21.     A HAMP modification is processed in two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan

---

payment over to the mortgage owner; and (d) income from investment interests in the pool of mortgage loans that the servicer is servicing.

[4]   The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01"), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview") and Supplemental Documentation – Frequently Asked Questions ("HAMPFAQS") and Supplemental Directive 09-08 ("SD 09-08"). These documents together describe the basic activities required under HAMP.

("TPP").[5] The TPP is a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided by the homeowner.

22.     IndyMac offers TPPs to eligible homeowners by way of a TPP Agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements, so long as the documentation confirms that the homeowner is eligible for a HAMP modification.

23.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification if eligible.

24.     IndyMac has routinely failed to live up to its end of the TPP Agreement and offer permanent modifications to homeowners.   In February 2010, the U.S. Treasury reported that IndyMac's parent company had 112,200 HAMP-eligible loans in its portfolio. Of these loans, just 3,087 were granted permanent modifications (approximately 2.75%) even though many more homeowners, including Plaintiff, had made the payments and submitted the documentation required by the TPP Agreement.

25.     By failing to live up to its obligation under the TPP Agreement, IndyMac is leaving homeowners in a complete state of confusion regarding the status of their homes and is preventing homeowners from pursuing other avenues of resolution, including using the money they are putting towards TPP payments to fund bankruptcy plans, relocation costs, short sales or other

---

[5]     The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31 % of their monthly income for the next five years.

means of curing their default. In addition, the credit scores of homeowners have been negatively impacted as banks misreport trial payments as late payments and homeowners are encouraged to default on their loans in order to qualify for a loan modification.

## FACTS RELATING TO NAMED PLAINTIFF

26.     Plaintiff Stacey Fletcher is a self-employed, single mother and has been the owner of the property at issue in the State of Illinois (the "subject property") since July 2006. The subject property is Fletcher's primary residence.

27.     On July 7, 2006, Plaintiff took out a $276,000 mortgage loan for the purchase of her residence from Quicken Loans.

28.     The servicing of Plaintiff's mortgage loan was transferred to Defendant IndyMac sometime around October 2006 and her loan continues to be serviced by IndyMac to this date.

29.     On or about August 2008, Plaintiff encountered financial difficulties. Her current mortgage responsibilities began to exceed her gross monthly income, and therefore, she struggled to make her monthly mortgage payments.

30.      In search of financial relief, Plaintiff conveyed multiple requests to IndyMac for loan modifications. Her initial request was made online in or around February 2009. Several months later, after Plaintiff had followed up by sending financial documentation, IndyMac representatives reported that they had no record of her request. Plaintiff was then asked to resubmit her request as a result of the acquisition of IndyMac by OneWest. In June 2009, Plaintiff made a second request for a loan modification, resubmitted her paperwork to IndyMac and followed up by telephone and in writing.

31.     By letter dated October 9, 2009, IndyMac advised Plaintiff that she did not qualify for a loan modification because she was current on all her payments. The letter also indicated that

on August 11, 2009, IndyMac had adopted the HAMP program and agreed to follow the rules and guidelines established by the U.S. Department of Treasury.

32.     An IndyMac customer representative then instructed Fletcher to miss her loan payments in order to qualify for the loan modification through the HAMP Program and then to reapply for a loan modification.  Relying on this advice (and continuing to experience financial hardship), Fletcher fell behind on her loan payments for the months of November and December of 2009.

33.      In December 2009, Plaintiff received two letters from IndyMac stating that it had determined that she had fallen behind on her mortgage and that she may be able to qualify for a number of loss mitigation options, including loan modification, to prevent foreclosure and help her stay in her home.

34.     In December 2009, Plaintiff applied for a loan modification under the HAMP program for a third time.

35.     In January 2010, an IndyMac customer representative informed Plaintiff via telephone that she was approved for a "three month trial modification plan" and that relevant documents were in the mail.  The representative also informed Plaintiff that any proceedings against her would be put on hold during the trial plan and, that after she proved that she could make the three trial payments, the loan would be permanently modified, the two missed payments would be rolled back into the modified loan and all the late fees would be waived.

36.     Despite this conversation, during the remainder of January, IndyMac sent Plaintiff several letters indicating that her loan payments were in serious default and acknowledging a recent, yet insufficient loan payment.

37. By letter dated February 15, 2010, IndyMac offered Plaintiff a TPP under HAMP. To accept the offer, Plaintiff was required to make "a new monthly payment of $1,364.00 for the next three months of the trial period." The letter stated that, in order to receive a permanent modification, Plaintiff needed to make all the trial period payments on a monthly basis (on dates established by IndyMac) and to send IndyMac copies of certain documentation, including a completed Hardship Affidavit, and IRS Form 4506-T and income verification, such as a recent quarterly per year-to-date profit/loss statement, no later than February 25, 2010:

> Congratulations! You are approved to enter into a trial period plan under the Home Affordable Modification Program! This is the first step towards lowering your mortgage payments. Please read this letter so that you understand all the steps you need to take now to lower your mortgage payments permanently.
>
> **What do I need to do first?** To accept this offer, you must make a new monthly payment of $1,364.00 for the next three months of the trial period. This payment is due on the first day of each month. So your first payment is due 3/1/2010, your second payment is due 4/1/2010 and your third payment is due 5/1/2010. <u>Send these payments instead of your normal monthly mortgage payment</u>.
>
> **How do I get a permanent modification?** If you do not make each trial period payment in the month in which it is due, your loan may not be modified under the Home Affordable Modification Program.
>
> In addition to making your trial period on time, you must send copies of all the documents that are checked below to IndyMac Mortgage Services…

*See* Ex. A (emphasis in original).

38. On or about February 20, 2010, Plaintiff received additional information from IndyMac about her TPP. A document entitled "Sign & Return: Additional Information" reiterated that that the terms of her TPP were effective on the day she made her first trial period payment, provided that she made her payment on or before the March 1, 2010 deadline. Any late fees associated with late payments that preceded the TTP would be waived upon permanent modification. The document also explained that although her loan documents would remain in

effect, she should make the trial period payments *instead* of the payment required under her loan documents. *See* Ex. B (emphasis added).

39.    Plaintiff signed this document the day she received it and mailed it, along with her first trial period payment in the amount of $1364.00, to IndyMac on February 21, 2010. She also sent IndyMac all of the requested documentation prior to the deadline of February 25, 2010.

40.    On February 26, 2010 (again, three days *prior* to the first payment due date) IndyMac sent Fletcher a letter advising her that it could not consider her for a permanent modification because of her failure to make her trial period payments (which were not yet due):

> You were recently mailed a very important trial loan modification offer. We are committed to determine if you are eligible for a permanent loan modification. Unfortunately, we cannot complete our review because of missing payment(s):
>
> - One or more of your trial payments have not been received. In order for us to continue the review of your modification request, you will need to remit all past due trial modification payments and make timely future payments as outlined in your trial modification agreement…
>
> Once we have received your payment(s), we will complete our review of your loan to determine if you are eligible for a permanent loan modification.

41.    Shortly after receiving this letter, Plaintiff called IndyMac. A customer service representative told her that IndyMac had no record of receiving her first trial payment. However, because Plaintiff's bank verified that IndyMac had received her check on February 25, 2010 (again, four days prior to the March 1, 2010 deadline), the customer service representative promised to correct the error and to ensure that Plaintiff's account reflects timely payment.

42.    Plaintiff made each of the payments contemplated in the TPP Agreement due in March, April and May of 2010 in a timely manner. Yet, every month, the same problem arose – IndyMac's records failed to reflect her payments. Each month, IndyMac held on to Plaintiff's trial payments as "unapplied funds" instead of crediting them to her account as paid on time. When

IndyMac finally applied each trial period payment to her loan principal, it credited a partial payment toward the original loan monthly payment (not the reduced trial payments). As a result, Fletcher incurred hefty late fees each month for missed, late and insufficient payments and received threatening letters from IndyMac about the delinquent status of her loan.

43.     In addition to late fees, IndyMac also imposed miscellaneous fees in the amount of $212.00. Despite making her trial period payments, Plaintiff received a monthly statement dated April 19, 2010 reflecting a total amount due of $10,766.93. When Plaintiff inquired about this amount due, she was told by an Indy Mac customer service representative that the amount due was attributable to "fees" that had been incurred but could not explain their origin. By letter dated May 28, 2010, IndyMac explained that part of the fees, described by IndyMac as "Delinquent BPO Fees" and Inspection Fees," were for "funds advanced" and "assessed" by IndyMac and paid to Plaintiff's account. Plaintiff never authorized such fees. In addition, her loan was neither "delinquent" nor was her house inspected on the dates that such fees were "assessed" by IndyMac.

44.     Despite Plaintiff's compliance with the terms of the TPP Agreement, timely provision of all documents requested by IndyMac and timely payment of her TPP payments, Plaintiff continues to receive monthly "grace period" notices from IndyMac threatening that her "loan is more than 30 days past due" and that she has a 30 day grace period during which the law prohibits IndyMac from taking any legal action against her.

45.     During the TPP period, IndyMac reported her loan as delinquent to credit bureaus, and as a result, Plaintiff's credit score has been negatively affected and her credit card accounts have been closed.

46.     Despite Plaintiff's continued compliance in all material respects with the terms of the TPP Agreement and IndyMac's written offer to her, Plaintiff has still neither been considered for nor offered a permanent loan modification under the HAMP Program guidelines.

47.     Defendant has therefore breached its promise to consider Fletcher for a loan modification and to permanently modify her loan if she is eligible. At this point, the TPP is now in its sixth month.

48.     Like other borrowers, Fletcher has been living in fear that she will not be considered for a loan modification and without any assurances that her home will not be foreclosed upon, despite her acceptance of and performance under her contract with IndyMac, compliance with HAMP requirements and her continued monthly payments under the TPP Agreement.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

50.     Plaintiff brings this class action on behalf of herself and a Nationwide Class and Illinois Subclass of homeowners whose loans have been serviced by Defendant and who, since August 18, 2009, have complied with their obligations under a written TPP Agreement, but have not received a permanent HAMP modification if eligible.

51.     Excluded from the Classes are 1) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parent companies have a controlling interest and their current or former officers and directors; 2) persons who properly execute and file a timely request for exclusion from the Class or Subclass; and 3) the legal representatives, successors or assigns of any such excluded persons.

52.     Plaintiff sues on her own behalf and on behalf of a class of persons as described above under Rule 23(a) and (b) of the Federal Rules of Civil Procedure.

53. Plaintiff does not know the exact number or identities of the members of the proposed Classes, since such information is in the exclusive control of Defendant. Plaintiff believes that the Class encompasses many hundreds of individuals whose identities can be readily ascertained from Defendant's books and records. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

54. Based on the size of the mortgage loans at issue, with accrued penalties, fees and interest, Plaintiff believes the amount in controversy exceeds $5 million.

55. All members of the Class and Illinois Subclass have been subject to and affected by the same conduct. The claims are based on form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the Classes. These questions include, but are not limited to the following:

    a. Whether IndyMac's TPP Agreements required it to extend modification agreements or otherwise offer permanent loan modifications when its borrowers complied with their requirements under the TPP Agreements and were otherwise eligible under HAMP;

    b. Whether IndyMac breached an express term of its TPP Agreements with Plaintiff and the Class Members by failing to consider them for and to extend offers for permanent modification to Plaintiff and the Class Members;

    c. Whether IndyMac breached an implied term of its TPP Agreements with Plaintiff and the Class Members by failing to consider them for and to

extend offers for permanent modification to Plaintiff and the Class Members;

d.      Whether IndyMac breached the implied covenant of good faith and fair dealing by repeatedly requesting its borrowers produce documentation already in its possession and by taking other steps to delay or prevent the extension of offers for permanent modification;

e.      Whether Plaintiff and the Class Members reasonably relied on the material representations made by Defendant relating to the offer of a permanent loan modification, and whether Plaintiff and the Class suffered damage as a result of their reasonable reliance;

f.      Whether IndyMac's conduct violates the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

g.      Whether the Court can order damages, and the amount of such damages; and

h.      Whether Plaintiff and Class and Subclass Members are entitled to injunctive relief.

56.     The claims of the individual named Plaintiff are typical of the claims of the Classes and do not conflict with the interests of any other members of the Class and Subclass in that Plaintiff and the other members of the Class were subject to the same conduct, applied for a loan modification, complied with all requirements and were met with purposeful disorganization, ignorance and confusion on the part of IndyMac and a failure to even be considered for a permanent modification.

57.     The individual named Plaintiff will fairly and adequately represent the interests of the other members of the Class and Subclass.  Plaintiff is committed to the vigorous prosecution of the claims of both Classes and has retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

58.     A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

59.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and (3).

60.     Defendant has acted or refused to act on grounds that apply generally to the Classed so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classed as a whole.

## COUNT I

### Breach of Contract
### (on behalf of the Nationwide Class)

61.     Plaintiff repeats and re-alleges the allegations in paragraphs 10-49 above as if set forth herein in full.

62.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Nationwide Class described above.

*Contract Formation:  Offer and Acceptance*

63.     As described above, the TPP Agreement executed by Defendant and Plaintiff constitutes a valid contract.

64.     IndyMac sent Plaintiff a written offer inviting her acceptance by signing the document and providing verification.  Defendant represented that her eligibility would hinge solely

on her verified income. Plaintiff accepted this written offer by executing the TPP Agreement and sending it back to IndyMac along with all outstanding necessary documentation to verify her eligibility.

65.     In the alternative, IndyMac's sending of the TPP Agreement to Plaintiff was an invitation to deal. Plaintiff's execution of the TPP Agreement on February 20, 2010 and sending to Defendant any necessary documentation to verify her eligibility constituted an offer. Defendant accepted the offer by accepting the TPP payments.

***Contract Formation:  Consideration***

66.     The TPP Agreement is supported by consideration in the form of an exchange of mutual promises. Plaintiff promised to keep her information current and to make the temporary payments on time. In exchange, IndyMac promised to consider Plaintiff for and offer her (upon continued eligibility) a permanent modification agreement.

67.     In addition, or in the alternative, the TPP Agreement is supported by further consideration in the form of each party foregoing legal obligations and rights. Plaintiff forewent alternative avenues she could have pursued including, by way of example, bankruptcy or listing the property.  IndyMac agreed to forego foreclosure proceedings and late fees.  Both sides benefited from the exchange in that Plaintiff was presented with an opportunity to save her home and IndyMac enjoyed the ability to comply with its promises to the government in connection with the sale to OneWest, keep customers, receive incentive payments from the government for performing the modification, and avoid or mitigate the costs and risks associated with foreclosure.

68.     In the alternative, and explained in Count II and as incorporated fully herein, Plaintiff's justifiable reliance serves as a substitute for any lack of consideration.

*Plaintiff's Performance*

69.     Plaintiff and the Class Members made their temporary trial payments and otherwise complied with the TPP Agreements by making and continuing to make their required payments, keeping all information and representations true and accurate in all material respects, and by taking all such other steps necessary under their respective TPP Agreements.

*Express Contract Terms*

70.     The TPP Agreement also provided that if Plaintiff and the Class Members made their three trial payments on a timely basis, and otherwise complied with the terms of their TPP Agreements, then IndyMac would consider them for, and if eligible, offer them a permanent loan modification, and waive any unpaid late charges accrued prior to the trial period.

*Defendant's Breach of Express Terms*

71.     Defendant intentionally and systematically delayed converting TPP Agreements into permanent modifications by falsely claiming it lacked and repeatedly requesting documents, information and payments already in its possession, failing to acknowledge timely receipt of trial payments, failing to implement adequate procedures and systems to respond to inquiries and complaints, and by otherwise dragging out and delaying its extension of offers for permanent loan modification.

72.     Rather than extending offers for permanent modification to Plaintiff and the Class Members, Defendant, improperly and without justification, ultimately decided to treat the TPP Agreements as if they were null and void and threatened foreclosure.

*Implied Contract Terms*

73.     Insofar as IndyMac did not breach an express term of the TPP Agreement, IndyMac breach an implied term that required IndyMac to consider Plaintiff and Class Members for and to

extend the offers for permanent modification within a reasonable period of time following Plaintiff's and the Class Members' performance under the TPP Agreements.

74.     The TPP Agreement, like all contracts entered into in Illinois, contained an implied duty of good faith and fair dealing. Insofar as the TPP Agreement placed discretion and broad authority in IndyMac to determine HAMP eligibility and to administer the HAMP modification program, IndyMac had a duty to perform consistent with its duty of good faith and fair dealing.

***Defendant's Breach of Implied Terms***

75.     Defendant routinely and regularly breached these implied duties of good faith and fair dealing by:

    a.      failing to perform loan servicing functions consistent with its responsibilities to Plaintiff and high professional standards of care;

    b.      failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys or otherwise use individuals with suitable training, education, experience and skills to perform loan servicing functions;

    c.      routinely demanding information and payments already in its possession and otherwise failing to implement an appropriate and functioning document management system;

    d.      providing false justifications for refusing to extend offers for permanent modification;

    e.      systematically making inaccurate calculations and determinations of Plaintiff's and the Class Members' eligibility for HAMP;

      f.      unreasonably delaying the extension of offers for permanent modifications to borrowers who perform fully and faithfully under their TPP Agreements;

      g.      acting in a manner that otherwise constitutes an abuse of discretion or authority under the TPP Agreement or taking such other steps to frustrate Plaintiff's ability to receive the benefit of her bargain under the TPP Agreement; and

      h.      failing to acknowledge timely receipt of all trial payments and requested documentation.

***Causation and Damages***

76.    As an actual and proximate result of IndyMac's breaches of these express and implied contractual terms described herein, Plaintiff and Class Members have suffered harm and are threatened with additional harm. Plaintiff and Class Members have been damaged insofar as they have been improperly denied offers for permanent loan modifications, which they stand ready, willing and able to accept.

77.    Plaintiff and Class Members have further been damaged in the form of lost time and opportunity costs of pursuing other means of dealing with their default. By making TPP payments both during and after the TPP, Plaintiff and Class Members forewent other remedies that might have been pursued to save their homes, such as restructuring their debt under the federal bankruptcy laws with less of an arrearage, or pursuing other strategies to deal with their defaults, such as selling their homes with less of an arrearage as an impediment. In addition, when a permanent modification was not offered at the close of the three-month TPP, IndyMac's breach caused Plaintiff and Class Members damages in the form of fees, charges, accrued interest and other costs improperly applied to their accounts.

78.     Plaintiff and Class Members were also harmed by IndyMac's misreporting of delinquent trial payments to the credit bureaus.  As a result, the credit scores of Plaintiff and putative members of the Class were severely impacted and credit cards were either cancelled or available credit was reduced.

79.     On information and belief, some putative Class Members have suffered additional harm and expense in the form of defending foreclosures of their homes when, in reality, they should have been extended offers for permanent modifications of their mortgage loans and several months into their modified permanent payment plans.

## COUNT II

### Promissory Estoppel, In the Alternative to Count I
### (on behalf of the Nationwide Class)

80.     Plaintiff repeats and re-alleges the allegations of paragraphs 10-49 above as if set forth herein in full.

81.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Nationwide Class described above.

82.     Defendant, by way of its TPP Agreements, unambiguously promised to Plaintiff that if she executed and returned the TPP Agreement to IndyMac along with supporting documentation, and made her TPP payments, she would be considered for and ultimately receive an offer for permanent modification if eligible.

83.     Defendant's promise was intended to induce Plaintiff to rely on it and to make monthly TPP payments and otherwise perform.

84.     Plaintiff indeed relied on Defendant's promise by submitting TPP payments and all necessary documentation and otherwise fully performing under the TPP Agreement.

85.     Given the language in the TPP Agreement, statements made by IndyMac's customer service representatives, and the fact that the TTP agreement was backed by a federal governmental program, Plaintiff's reliance was reasonable.

86.     Plaintiff's reliance was to her detriment. By making TPP payments both during and after the TPP, Plaintiff and Class Members forewent other remedies that might have been pursued to save their homes, such as restructuring their debt under the federal bankruptcy laws with less of an arrearage, or pursuing other strategies to deal with their defaults, such as selling their homes with less of an arrearage as an impediment.  In addition to the lost time and opportunity cost of pursuing other means of dealing with their default, when a permanent modification was not offered at the close of the three-month TPP, Plaintiff and Class Members suffered damages in the form of fees, charges, accrued interest and other costs applied to their accounts.

87.     Plaintiff and Class Members were also harmed by IndyMac's misreporting of delinquent trial payments to the credit bureaus.  As a result, the credit scores of Plaintiff and putative members of the Class were severely impacted and credit cards were either cancelled or available credit was reduced.

88.     On information and belief, some putative Class Members have suffered additional harm and expense in the form of defending foreclosures of their homes when, in reality, they should have been extended offers for permanent modifications of their mortgage loans and several months into their modified permanent payment plans.

## COUNT III

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act
815 ILCS 505/1, *et seq.*
(on behalf of the Illinois Subclass)**

89.     Plaintiff repeats and re-alleges the allegations of paragraphs 10-49 above as if set forth herein in full.

90.     Plaintiff, Subclass Members and Defendant were natural persons or their legal representatives, partnerships, corporations, companies, trusts, business entities, or associations. Plaintiffs and Subclass Members are "consumers" under 815 ILCS 505/1(e) as they are persons who purchased or contracted for the purchase of loan services.

91.     Defendant is engaged in the distribution of loan services.

92.     The Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq*, provides in pertinent part that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act [15 U.S.C. § 45].

***Deceptive Acts and/or Practices***

93.     Plaintiff expressly repeats and re-alleges the allegations of paragraphs 10-49 above as if set forth herein in full.

94.     Defendant engaged in deceptive acts by intentionally misrepresenting and concealing material facts concerning the loan modification process under HAMP, including:

a.      inducing Plaintiff and Subclass Members to default on their mortgage loans in order to become eligible for a loan modification under HAMP when Defendant knew or should have known that this was not required under HAMP;

b.      failing to offer Plaintiff and Subclass Members a permanent modification to after they make all their trial payments on time and supplied Defendant with the necessary documentation;

c.      inducing Plaintiff and the Subclass Members to make TTP payments in lieu of the payment required under their loan documents and then imposing hefty late fees and other unauthorized fees (such as delinquency and inspect fees) during the TPP period; and

d.      threatening foreclosure proceedings during the TPP period when it promised to forego such proceedings during this period and it induced Planitiff and Subclass Members to default on their loans in order to obtain permanent modifications.

95.      Defendant intended that Plaintiff and Subclass Members rely on its representations with respect to its promise to provide and consider them for permanent modifications.  Defendant's omissions and representations were material.  If Plaintiff were not told that she would receive loan modifications with reduced mortgage payments, she would not have submitted her documentation or made trial payments.

*Unfair Acts and/or Practices*

96.     Defendant's conduct as described above in paragraphs 10-49 constitutes "unfair" practices that not only caused substantial harm to Plaintiff and Subclass Members, but harmed the general public as well.

97.     Defendant's immoral, unethical, oppressive and unscrupulous practices, which were implemented so as to delay the process as long as possible and to extract as much money as possible from borrowers Defendant identified as being at risk for default prior to foreclosure, included but were not limited to:

a.      Defendant knowingly designed and maintained a loan modification system that was riddled with flaws and intentionally staffed with employees who lacked the training, experience, education or skill to accurately perform their obligations.

b.      IndyMac routinely lost loan documents, modification papers and other necessary materials to evaluate eligibility and routinely rejected Plaintiff and Subclass Members' TPP Agreements on false and incorrect grounds.

c.      Defendant routinely required Plaintiff and Subclass Members to submit and re-submit documents and financial information already in its possession claiming that it would not review a borrower for eligibility until and unless these documents are submitted time and again.

d.      While continuing to accept Plaintiff and Subclass Members' modified mortgage payments, Defendant sent them monthly letters threatening foreclosure or other severe consequences, while these borrowers in fact should have received offers for permanent modification.

e.  Defendant routinely provided false information regarding its processes and standards, refused to put statements in writing when asked.

f.  Defendant engaged in other conduct designed to extract money from "at risk" borrowers as opposed to actually helping such borrowers - who were at all times HAMP eligible - achieve modified loan terms.

98.  Defendant's acts or practices offend the clearly stated public policy of offering financial relief to homeowners who are in serious risk of foreclosure on their homes.

99.  Defendant's deceptive and/or unfair acts and practices described herein occurred in the course of conduct involving trade and commerce.

100.  Plaintiff and Subclass Members have suffered substantial injury and actual damages as an actual and proximate result of the Defendant's unfair and/or deceptive practices and acts. By making TPP payments both during and after the TPP, Plaintiff and Subclass Members forewent other remedies that might be pursued to save their homes, such as restructuring their debt under the federal bankruptcy laws with less of an arrearage, or pursuing other strategies to deal with their defaults, such as selling their homes with less of an arrearage as an impediment. In addition to the lost time and opportunity cost of pursuing other means of dealing with their default, when a permanent modification was not offered at the close of the three-month TPP, IndyMac's unfair and/or deceptive practices and acts caused Plaintiff and Subclass Members damages in the form of fees, charges, accrued interest and other costs applied to their accounts.

101.  On information and belief, some putative Subclass Members have suffered additional harm and expense in the form of defending foreclosures of their homes when, in reality, they should have been extended offers for permanent modifications of their mortgage loans and several months into their modified permanent payment plans.

102.     Plaintiff and Subclass Members were also harmed by IndyMac's misreporting of delinquent trial payments to the credit bureaus.  As a result, the credit scores of Plaintiff and putative members of the Class were severely impacted and credit cards were either cancelled or available credit was reduced.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.     Certify this case as a class action and appoint named Plaintiff to be Class representative and her counsel to be Class counsel;

B.     Award Plaintiff and Class Members actual and compensatory damages for breach of contract and breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial;

C.     Award actual and compensatory damages and order other equitable relief as justice requires, including requiring Defendant to extend Plaintiff and Class Members offers for permanent loan modifications on the theory of promissory estoppel;

E.     Enter an Order preliminarily and permanently enjoining IndyMac's deceptive and unfair business practices as alleged herein, requiring Defendant to extend Plaintiff and the Subclass Members permanent modifications of their loans as required by the HAMP, and award actual, compensatory and punitive damages for Defendant's violations of the Illinois Consumer Fraud Act, along with interest and attorneys' fees and costs;

F.     Order specific performance of Defendant's contractual obligations together with other relief required by contract, equity and law;

G.     Award actual and punitive damages to the Plaintiff and the Class and Subclass;

H.    Award Plaintiff the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

I.    Enter an Order preliminarily and permanently enjoining Defendant from initiating or proceeding with any foreclosure proceeding without first fairly and accurately determining whether the borrower named in the foreclosure proceeding is eligible for a HAMP or other modification; and

J.    Grant Plaintiff and the Class and Subclass such other and further relief as this Court fords necessary and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  July 27, 2010                          Respectfully Submitted,

                                               EDELSON MCGUIRE, LLC


                                               By:  /s/ Irina Slavina
                                               Jay Edelson
                                               Steven Lezell
                                               Rafey S. Balabanian
                                               Irina Slavina
                                               350 N. LaSalle Avenue, Suite 1300
                                               Chicago, Illinois 60654
                                               Tel:  312-589-6370
                                               Fax:  312-589-6378

                                               ABBEY SPANIER RODD & ABRAMS, LLP
                                               Karin E. Fisch
                                               Grace E. Parasmo
                                               212 East 39th Street
                                               New York, New York 10016
                                               Tel.:  212-889-3700
                                               Fax:  212-684-5191

                                               *Attorneys for Plaintiff*